EMIL H. MUELLER ET AL., APPELLANTS, V. EUGENE P. KEELEY, APPELLEE.
85 N. W. 2d 309

Filed October 11, 1957. No. 34218.

*Charles A. Fisher* and *Dean L. Donoho*, for appellants.

*William B. Quigley* and *Healey, Davies, Wilson & Barlow*, for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

The plaintiffs, Emil H. Mueller and Charles J. Mueller, brought this action in the district court for Cherry County against Eugene P. Keeley, defendant, for breach of a warranty agreement. By stipulation of the parties a jury was waived and trial had to the court. The court found generally in favor of the defendant and against the plaintiffs and made a specific finding that the plaintiffs, by use of the machine, the subject of a contract between the plaintiffs and the defendant, had waived their right to rely upon rescission of the contract. Judgment was entered in favor of the defendant, and plaintiffs' action was dismissed. Plaintiffs filed a motion for new trial which was overruled. From the order overruling the motion for new trial, the plaintiffs appealed.

The plaintiffs' amended petition alleged in substance that on or about November 4, 1953, the plaintiffs and defendant entered into an agreement which recited that on or about May 25, 1953, the defendant sold and delivered to the plaintiffs a tractor equipped with a gravel loader and that said tractor and loader failed to perform as intended by the parties. Referring to the contract of November 4, 1953, between the parties, it stated that in consideration of the plaintiffs' forbearance to rescind the

sale and file suit the prayer of which would be to recover the purchase price for the tractor, the defendant agreed that he would, on or before November 14, 1953, install on said tractor a hydraulic loader equipped with a bucket of at least $7/8$ cubic yard capacity and make such other modifications, changes, and repairs as the defendant deemed necessary for the operation of the tractor in plaintiffs' gravel operations; said tractor was to be delivered complete with the foregoing installations, modifications, changes, and repairs to the plaintiffs not later than November 14, 1953; and all expenses of such modifications, repairs, and delivery were to be borne by defendant who was, upon delivery, to pay the plaintiffs the sum of $165 to cover the cost of repairs already incurred by the plaintiffs. The defendant was to warrant the tractor and loader as if they were new, repairing them and reimbursing plaintiffs for repairs as is customary in the purchase of new tractors and loaders. The agreement further provided that if the equipment failed to perform satisfactorily in the customary and ordinary manner the defendant was to refund to the plaintiffs $5,100 and their old tractor and loader in as good condition as said tractor and loader stood when the sale was consummated. The plaintiffs agreed that they would give the tractor and new loader a fair trial in the customary and ordinary operation of their sand and gravel business for a period of 15 days, keeping the same serviced during the trial period according to the operation manual furnished by the defendant, the trial period to commence the first working day after the return of said tractor and loader to the plaintiffs. If the equipment as modified was not delivered to the plaintiffs by December 1, 1953, the defendant was to refund $5,400 and return plaintiffs' old tractor to the plaintiffs. Plaintiffs further alleged that the equipment with the modifications and repairs deemed necessary by the defendant was delivered to plaintiffs on or about November 16, 1953; and that the tractor and loader failed to perform satisfactorily in

the customary and ordinary manner as follows: (1) The shaft that drives the hydraulic pump broke; (2) one of the hydraulic hoses swelled and had to be replaced and another of the hoses leaked; (3) the gears of the tractor were hard to shift and would grind while shifting; (4) the hinge pins holding the loader were not of suitable material and the same had worn excessively; and (5) three stud bolts twisted off and two stud bolts stripped off the chain casings. The plaintiffs further alleged that more than 10 days had elapsed since the ending of the trial period and plaintiffs had not been paid the sum of $5,100, nor had their old tractor been returned; that the fair and reasonable value of the old tractor was $2,500 and the same was indispensable to plaintiffs and unobtainable elsewhere without considerable expense; that plaintiffs were ready, willing, and able to return to defendant the tractor that was the subject of the agreement; that on or about December 5, 1953, the defendant was orally notified that said tractor and loader had failed to perform satisfactorily in the customary and ordinary manner as provided for in said agreement; and that on December 12, 1953, the defendant was orally informed to the same effect. The plaintiffs prayed for judgment against the defendant for the sum of $7,600, interest, and costs.

The amended answer of the defendant admitted the execution of the warranty agreement; specifically denied that the equipment failed to perform satisfactorily and that the defendant was notified of such nonperformance; and also contained a general denial of the allegations pleaded in the plaintiffs' amended petition, except for certain admissions. The amended answer also alleged that the defendant performed fully all of the terms of the warranty agreement and plaintiffs failed to meet the terms of that agreement in that (a) they failed to notify the defendant within 10 days after the 15-day trial period that the equipment did not perform satisfactorily; and (b) they failed to give the equipment a fair trial, in that

they used it to do work in excess of the normal and customary manner of use of such equipment. The answer further alleged that the equipment furnished under the contract was fully capable of performing the work which it was agreed it would do; that it can and did perform the types of operations it was warranted to perform; and that whatever breakage, wear, and tear occurred was usual, normal, and expected in the operation of all heavy machine equipment, and was due to no defect in the machine. The answer further alleged that if there was failure to perform in the customary and ordinary manner it was due to the plaintiffs' carelessness and neglect in operation of the machine and in using it to perform work which the equipment was not warranted to perform and work not classified in the ordinary and customary operation of a gravel business, including use of the equipment to perform a kind of work that could only be performed by a dragline; that since the date of plaintiffs' receipt of the equipment in November 1953, plaintiffs had kept said equipment in their possession at their gravel pit, using the equipment continuously during that period of time for the purpose of loading gravel; that by reason of such constant use the equipment had subsequently depreciated in value; and that the value thereof was substantially less than it would have been at the close of the trial period in December 1953, or January 1954. The prayer was for a dismissal of the plaintiffs' case and costs.

The plaintiffs' reply was in effect a general denial of the affirmative allegations of the defendant's amended answer.

The record discloses that the plaintiffs are partners in a sand and gravel business at Hanover, Kansas. The defendant, Eugene P. Keeley, is an equipment and machinery dealer at Valentine, Nebraska. In May 1953, the plaintiffs and defendant entered into an agreement by the terms of which the defendant was to take the plaintiffs' 1947 or 1948 model Hough loader valued

at $2,350, and in addition the plaintiffs were to pay the defendant $5,600, the defendant in turn was to deliver to the plaintiffs a new Harris tractor and a Laird front-end loader. In connection with this agreement, the plaintiff, Emil Mueller, met the defendant in May 1953, and prior to entering into the agreement the defendant visited the scene of the plaintiffs' gravel operations, both the river operation where gravel is stock piled and the dry pit operation from which gravel is taken or excavated. Subsequent to the sale of the equipment to the plaintiffs they became dissatisfied with the operation of the equipment. As a result, an attorney was employed by the plaintiffs to represent their interests. This attorney prepared an agreement on November 4, 1953, which has heretofore been referred to in the pleadings. Broadly speaking, the agreement provided that in consideration of the plaintiffs' forbearance from taking legal action to rescind the previous sale or the contract made in May, the defendant would make certain modifications deemed necessary for the proper operation of the tractor in plaintiffs' gravel business, and deliver the equipment as modified by November 14, 1953, with a warranty the same as for new equipment. If the equipment, as modified, failed to perform satisfactorily in the customary and ordinary manner during a 15-day trial period in which the plaintiffs were to give the equipment a fair trial in the customary and ordinary operation of their business, the defendant was, within 10 days, to refund the sum of $5,100 and return the plaintiffs' Hough tractor in as good condition as when it was traded.

Prior to the acceptance of the agreement, the plaintiffs' attorney submitted to the defendant a document which is the modification contract dated November 4, 1953, in which appeared the following language: "* * * fails to perform satisfactorily in the customary and ordinary operations of the sand and gravel *excavation* and loading carried on by said first party" as a condition to the refund by the defendant. The defendant objected

to the language, and the plaintiffs' attorney agreed to delete the following language: "* * * operations of the sand and gravel excavation and loading carried on by said first party (plaintiffs)," and insert instead the word "manner" thus deleting the word "excavation." After the agreement was signed, modifications called for in it were made. Defendant's mechanic who worked on heavy equipment was sent to Hanover, Kansas, to make the modifications which included changing the motor, installing a new compound rear end on the tractor, putting on the loader, and putting wrist pin bolts on the wheels. This mechanic was assisted by a representative of the Harris Manufacturing Company.

Upon completion of the modifications, the equipment was delivered to the plaintiffs at their place of business on November 16, 1953, and the trial period was to begin the next day. During the trial period, the equipment was operated in one of the dry pits leased by the plaintiffs. No stock pile of gravel is maintained in the dry pits. Gravel is customarily excavated by hitting the pit with the edge of the bucket to loosen the gravel so that it may be loaded. This type of operation subjects the equipment to much more wear and tear and abuse than use of it at a stock pile.

One of the plaintiffs, Emil Mueller, testified that there was no change in the type of his gravel operations after the original purchase of the machine until November 4, 1953; that he gave the machine a fair trial in the customary and ordinary operations of his business in the dry pit; that the equipment was used to scoop out gravel from the bank of the pit and load it on trucks; and that it would be easier on the machine to load loose sand out of the stock pile than to dig it out of the dry pit because the material is not set. He further testified that during the trial period, about the fourth day, the shaft broke on the hydraulic pump which is mounted on the front of the tractor, due to misalignment, and broke off a second time and was welded on and re-

aligned. To do this work took the rest of the day. One of the hydraulic hoses swelled and had to be replaced, and one leaked. The replacement of the hose cost $4.69, and is considered a minor item. There is further testimony that the gears on the tractor shifted hard and would grind while shifting. An employee of the plaintiffs testified that the gears were hard to shift. A mechanic testified that in March or April 1954, the gears in the transmission were worn out and had to be replaced. Emil Mueller testified that the hinge pins, where the bucket hinges on the loader for dumping, had worn excessively; that the gears on the bucket had worn grooves into the pin; and that in the spring of 1954, on the recommendation of the plant manager of the Harris Manufacturing Company, one of the original pins was replaced by a cast-hardened pin furnished by the company. Emil Mueller further testified that during the trial period stud bolts twisted off in the chain cases; and that when the bolts were loose or missing the brace on the loader starts to work away, throwing stress on the other bolts, and something has to be done or it would fall off and ruin the machine.

Schultz, an employee of the plaintiffs who operated the equipment in question, testified that the studs in the chain cases had to be tightened, and would stretch, allowing the oil to leak out; and that during the trial period he replaced 15 to 20 studs, having trouble with some of them when they broke off before being replaced. A mechanic testified that he took a few bolts out of the chain cases once; that to do so he had to weld a piece onto the bolts to get them out; and that the bolts stretch if too much pressure is exerted on them.

Schultz further testified that after the 9th day of the trial period, the Harris tractor and loader were taken to the river plant where they were used for loading, and a crane or dragline was used in the dry pit.

The attorney for the plaintiffs prepared the instrument dated November 4, 1953. On December 5, 1953, he had

a conversation with the defendant. He took along a letter he had received from the plaintiffs and read to the defendant the complaints of the plaintiffs with reference to the equipment. These complaints appear in the pleadings, and have been previously referred to in the testimony. The defendant made certain observations with reference to the complaints, as to what should be done to cure these defects, and stated he would do so. Just before Christmas 1953, this attorney had a conversation with the defendant to the effect that the plaintiffs refused to accept the defendant's offer to repair the machine in the manner that he had suggested; they wanted their tractor returned and their money back. The defendant said he would not comply with this request.

On January 11, 1954, the plaintiffs went to Valentine, Nebraska, contacted the defendant, and told him that they wanted their tractor returned to them and also wanted the money returned to them as provided for in the contract. The defendant refused to do this.

The record also discloses that during the course of the use of the equipment by the plaintiffs, they had certain repairs made on it, but they did not notify the defendant of the amount of these repairs or say anything to him about them.

The plaintiffs retained the equipment in their possession at all times and used it occasionally in an emergency to load gravel, according to their testimony, not in excess of 150 hours.

The defendant testified that the plaintiffs' attorney, in December 1953, communicated to him some of the complaints of the plaintiffs; that while it was claimed there was some talk of settlement, there was no such talk on the occasions when he met plaintiffs' counsel; that on January 11, 1954, the plaintiffs came to his showroom and asked him to settle the matter according to the terms of the agreement; and that he informed them that he had performed his part of the agreement

and if they had anything coming it would be on a warranty basis. That was all that was said. No demand was made on him for repairs to the equipment from the date of the warranty agreement. In December 1954, he drove to Hanover, Kansas, and examined the tractor. He could tell that it had been used by the shiny surface of the bucket. He further testified that the fair market value of the tractor and loader, from a resale point of view, was $2,000. He further testified that the standard rental on such equipment as the Harris equipment is $632 per month. There is also evidence that the rental value of such equipment would be $500, $550, or $600 per month. The defendant further testified that the reason for his insistence in having the language heretofore set out deleted from the modification agreement of November 4, 1953, and why he told the plaintiffs' attorney he would not stand for that language being in the agreement was because the machine would not properly perform in a dry pit operation. That was his opinion on November 4, 1953, when the agreement was consummated.

A witness engaged in the business of highway, sewer, and water main construction testified that his work requires the use of heavy equipment such as draglines, auto patrols, loaders, blades, and practically all such equipment used in moving dirt and gravel. He further testified that he went to Hanover, Kansas, with a photographer on June 3, 1955, and looked over the Harris equipment at the gravel operations of the plaintiffs. The Harris tractor was in a shed. He looked it over and noticed that it had been used that day, or within 24 hours. It had rained two days previous, and he was able to follow the tracks of the tractor where it had been backed into the shed. From his observation, it looked like the tractor had loaded three or four loads of gravel, and he believed it to be in normal operating condition. This witness further testified that the customary and ordinary operation for a four-wheel tractor

and loader in the gravel business would be for loading stock piled material, either dirt or gravel, any loose material, and could not be used for excavation successfully nor to dig material not broken loose. To do so would be hard on the Harris equipment.

Defendant's mechanic testified that he was engaged in mechanical work on heavy equipment and was acquainted with the Harris equipment. He had assembled and disassembled these tractors and was familiar with the loaders. He went to Hanover, Kansas, in November 1953, and was there a week, changing the motor and putting a compound rear end in the tractor which constituted a completely new installation. He also put wrist-pin bolts into the wheels. He was assisted by a representative of the Harris Manufacturing Company. He admitted having a conversation at one time with the plaintiffs' employee Schultz, wherein he told Schultz that the tractor would be unsuccessful in that gravel pit. The machine was first delivered to the plaintiffs in May or June 1953.

A witness employed by the Department of Roads and Irrigation as an engineer testified that he was acquainted with and knew about heavy equipment; that he had observed the use of heavy equipment in gravel pits and knew the general work of excavating and loading gravel; and that the customary and ordinary use of four-wheel front-end loading equipment in connection with gravel operations is to load when the gravel is taken out of the bank, and the loading is generally from a stock pile. The stock pile is gravel either pumped out and stocked up by the trucks, or stock piled by a dragline. He further testified that they have used the four-wheel front-end loader type in a gravel pit in loose gravel. In some coarse gravel pits this type of equipment would not work, but it can be used in loose gravel and to load out the stock piles into trucks.

The only assignment of error which need be considered

is that the judgment of the trial court is contrary to the evidence and the law.

The plaintiffs contend that the trial court was laboring under a misconception of the law by treating the plaintiffs' action as one in rescission instead of an action for damages for breach of contract, the first being an action in equity triable to the court and the latter being an action at law triable to a jury. In the instant case a jury was waived and trial was had to the court.

The plaintiffs cite Rasmussen v. Hungerford Potato Growers Assn., 111 Neb. 58, 195 N. W. 469, as follows: The two remedies of damages and rescission are inconsistent, the former proceeding upon affirmance, and the latter upon disaffirmance of a contract. See, also, Russo v. Williams, 160 Neb. 564, 71 N. W. 2d 131.

It will be observed in the instant case that there is a substantial conflict in the testimony on the several issues raised in the pleadings of the respective parties. The trial court made the following findings: "Now on this 3rd day of December, 1955, after due consideration of and deliberation upon the pleadings and all of the evidence introduced in this action, the court finds generally in favor of the defendant and against the plaintiffs and specifically finds from the evidence that the plaintiffs by use of the machine in question have waived their right to rely upon recision (sic)."

Section 25-1127, R. R. S. 1943, provides: "Upon the trial of questions of fact by the court, it shall not be necessary for the court to state its finding, except, generally, for the plaintiff or defendant, unless one of the parties request it, with a view of excepting to the decision of the court upon the questions of law involved in the trial; in which case the court shall state in writing the conclusions of fact found separately from the conclusions of law."

In the instant case no request was made by the plaintiffs for a specific finding of fact.

In Lancaster County v. Fitzgerald, 86 Neb. 676, 126

N. W. 141, the court said: "The general finding was sufficient to support the judgment. No special findings were requested by either side. In Moody v. Arthur, 16 Kan. 419, 429, Mr. Justice Brewer, after disposing of another branch of the case, uses this language: 'This really disposes of the case, for, in respect to the second question, it may be said that no special findings of fact were demanded, and that, while the court does find specially certain facts, it prefaces them with a general finding that "the allegations, all and singular, contained in the answer of the said defendants are true"—so that, whether the facts specially mentioned in the findings are of themselves sufficient to support the decree is practically immaterial, the court having covered all with a general finding.' "

The trial court made a general finding in favor of the defendant on all the pleaded issues and all of the evidence addressed thereto. Such a finding resolves all disputed facts in favor of the defendant, which includes (1) whether the damage to the equipment resulted from the ordinary and customary use of such equipment for which its use and performance was warranted, or whether it resulted from more severe and abusive use than that contemplated by the warranty; (2) whether the items of damage claimed to amount to breaches were minor items of repair which should be normally expected in the operation of such equipment; and (3) whether the plaintiffs complied with the provision of the warranty contract permitting defendant an opportunity to repair any defects which might appear, before plaintiffs could insist on a refund and the return of their machine. All of the above disputed facts were resolved in favor of the defendant by the trial court by a general finding which was in no way influenced by any claimed misconception of the law. We hold that the plaintiffs' contention is without merit.

The evidence discloses that the machine in question was referred to by the plaintiffs and other witnesses as

a loader. The customary and ordinary use of this type of machine is to load gravel from stock-piled material. When counsel for the plaintiffs presented the contract dated November 4, 1953, to the defendant on November 3, 1953, the defendant objected to its terms and insisted that the word "excavation" be deleted from the agreement which was done and the word "manner" inserted in its place. As testified to by the defendant: "Mr. Donoho on about the 3rd of November came in our office and talked about this agreement, and I told him what I would do, and what I wanted to do, and he came back on the 4th day of November with this agreement and I read it over, and I told him that I had explained to him the day before that I would not go along or sign the contract if the tractor was used in the future for gravel excavation purposes in a dry pit." The evidence discloses that the excavation of gravel was the type of use the plaintiffs gave the machine and that type of usage is what caused the breakage and wear that took place during the trial period of the machine and thereafter. The plaintiffs were well acquainted with the function of a loader. They owned one and knew of its proper use.

The rule is stated in 46 Am. Jur., Sales, § 351, p. 536, as follows: "In a contract to sell or a sale of exactly described goods * * * there is no warranty of fitness for any particular purpose other than that purpose for which the article is ordinarily or generally sold even though the buyer states that he is buying for some such particular or extraordinary purpose, if the buyer does not rely upon the judgment or representation of the seller that the goods are fit for such particular or extraordinary purpose." See, also, subdivisions (1) and (4) of § 69-415, R. R. S. 1943, Uniform Sales Act.

In the light of the evidence, the trial court could find, as it did, that any breakage or wear to the loader was occasioned by excessive, abusive, and strenuous use beyond that use for which the machine was warranted. It

is apparent from the evidence that it was not warranted for excavation of gravel in dry gravel pits.

The question arises as to whether or not the defects of the machine complained of by the plaintiffs amounted to a breach of the warranty agreement. This is a question of fact. The rule is: "Ordinarily, it is a question of fact * * * whether or not there has been a breach of warranty where the evidence is conflicting or is reasonably susceptible of more than one inference." 77 C. J. S., Sales, § 369, p. 1308.

The evidence discloses that in heavy machinery such as the machine in question breakage and wear and tear are normally incident to the operation. Several witnesses so testified.

As to the items claimed as breakage which the plaintiffs contend amounted to a breach of the contract, there was testimony that such items were common to all heavy earth-moving equipment, were minor, and were avoidable by proper care and operation on the part of the users. With reference to the complaint that the shaft driving the hydraulic pump broke, these repairs were made by the plaintiffs and did not require the services of a mechanic. The cost of such pumps is about $4, and such breakage is of a minor nature.

With reference to the swelling of the hydraulic hoses, this is a minor defect and so admitted by the plaintiffs.

With reference to the complaint that the gears would grind and were hard to shift, several witnesses testified that grinding of the gears is a common characteristic of equipment of this type and is in no sense fatal to the operation of such machine. However, new gears were placed in this equipment by the defendant's mechanic as heretofore shown by the evidence. The evidence also shows that gears on this type of equipment are, in most cases, hard to shift.

As to the hinge pins holding the loader, it appears that two or three pins were replaced after delivery of the machine for the trial period, and that two of these

were furnished free at the defendant's instance. Such pins cost about 60 cents and can be replaced in 10 or 15 minutes. The evidence shows that these hinge pins are subject to wear, and such an item is minor and a defect to be expected.

As to the stud bolts in the chain cases coming loose and some of them being twisted or sheared off, the evidence shows that such bolts must be kept tight like any other bolts, and if they become loose they will eventually shear off. These bolts, according to the testimony, are wearing parts, cost about 10 cents each, and can be replaced in 10 or 15 minutes if the difficulty is located in time.

Under such a factual situation, the trial court could find, and did find by a general finding, that no breakage or wear to the machine took place beyond that which plaintiffs reasonably should anticipate in the operation of heavy equipment of this sort. The machine was warranted only to perform satisfactorily and in the ordinary and customary manner as such machine should be used. Such a warranty is not to be breached by proof that the machine suffered certain items of wear and breakage such as would be experienced in normal use of any such equipment. The trial court found upon sufficient evidence that the equipment did in fact perform in the manner warranted. This finding is sufficient to sustain the judgment.

In the instant case the defendant was told about the complaints of the plaintiffs with reference to the machine. In this connection, the defendant proposed that certain repairs be made which he believed would cause the machine to render proper performance. The plaintiffs declined the offer and refused to permit the defendant to repair any of the claimed defects that might appear in the machine, and insisted upon payment of $5,100 and return of their old tractor. The defendant informed the plaintiffs that he would deal with them on a stand-

ard warranty basis. The plaintiffs refused the defendant's offer in this respect.

In the instant case the contract provided in part: "Said second party (defendant) further agrees that he will warrant both the tractor and loader as if the same were a new loader and tractor *repairing and reimburseing (sic) said first party for repairs either to the tractor or loader or both in the same manner and fashion as is customary in the purchase of new tractors and loaders. * * * In the event that said tractor and loader or either of them then fails to perform satisfactorily in the customary and ordinary manner, * * *"* then defendant was to refund $5,100 and return the old tractor. (Emphasis supplied.) Defendant offered to make repairs under the warranty as previously stated. This offer was rejected by the plaintiffs who thereafter retained and used the machine, causing to it additional depreciation and wear.

The rule is stated in 77 C. J. S., Sales, § 340, p. 1235, as follows: "Unless there is a definite condition to that effect, the buyer is not obliged, as a condition precedent to recovery on a warranty, to allow the seller to remedy defects. *If, however, the contract so stipulates, no liability for a breach of warranty attaches until the seller has had an opportunity to remedy defects, * * *.*" (Emphasis supplied.) See, also, Sandwich Mfg. Co. v. Feary, 40 Neb. 226, 58 N. W. 713.

In such a circumstance, plaintiffs are barred from any claim as a breach of contract. Considering this action as an action for damages for breach of contract, we conclude that the general finding of the trial court in favor of the defendant resolved in his favor all disputed issues of fact, and such finding is sufficient to support the judgment of the trial court.

The plaintiffs contend that the trial court tried this action as one in rescission when in fact it is an action at law for the recovery of damages. While we have not considered this action as one in rescission, which is an

equity action, even in an action for rescission the plaintiffs would be barred to recover under the contract for the reason that the plaintiffs at all times have exercised dominion over the equipment and continued to use it for their own purposes after the breakage and defects about which they complain. This retention and use by the plaintiffs is inconsistent with the claim necessary to a rescission action. Such use and consequent depreciation in the value of the property renders it impossible to place the parties in status quo. See Annotation 77 A. L. R. 1178.

For the reasons given in this opinon, the judgment of the trial court is affirmed.

AFFIRMED.