HENKLE & JOYCE HARDWARE COMPANY, APPELLANT, V.
MACO, INC., ET AL., APPELLEES.

239 N. W. 2d 772

Filed March 11, 1976. No. 39794.

Cline, Williams, Wright, Johnson & Oldfather, for appellant.

Ginsburg, Rosenberg, Ginsburg & Krivosha and Rodney P. Cathcart, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

CLINTON, J.

This is an action sounding in tort for money damages, founded upon an allegedly unlawful use of a trade secret. As the legal underpinning for its claim, the plaintiff relies upon a principle embodied in the following quotation from Restatement, Torts, section 757, page 1: "One who . . . uses another's trade secret, without a privilege to do so, is liable to the other, if . . . (b) his . . . use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him." A jury was waived and the action tried to the court. After both sides had rested the court took the matter under advisement, found generally for the defendants, and dismissed the plaintiff's petition. The plaintiff appeals. Its position in this court is: (1) It was entitled on the basis of undisputed evidence to a favorable finding on the issue of liability. (2) The court erred in certain "findings" it made in a letter opinion to counsel written at the time it announced judgment. (3) The trial court erred in failing to consider certain matters which it ought to have considered and by reason of which a different result would have been reached. The assign-

ments made by the plaintiff are more specific than the language we have used to summarize them. However, since we do not try this matter de novo, the foregoing summary will suffice for present purposes and we will note as necessary the assignments more specifically later.

We affirm the judgment of the trial court.

The standards which we apply to our review on this appeal are the following: The judgment of a trial court in an action at law where a jury has been waived has the effect of a verdict of a jury and should not be set aside unless clearly wrong. In determining the sufficiency of the evidence to sustain the judgment, that evidence must be considered most favorably to the successful party and every controverted fact must be resolved in that party's favor and he is entitled to the benefit of any inferences reasonably deducible from it. Burhoop v. Pegram, 194 Neb. 606, 234 N. W. 2d 828.

Henkle & Joyce Hardware Company, plaintiff, is owner of the claimed cause of action by reason of an assignment from a previously wholly owned subsidiary, Pacific Gun Sight Company. For convenience we refer to plaintiff as "Pacific." The corporate defendants were or are wholly owned by the individual defendant, Harley J. Bair and his wife. We will refer to the defendants collectively as Bair. Pacific and its predecessors were engaged in the assembly and sale of a variety of shotgun and metallic shell loaders which are generally referred to in the record as Deitemeyer loaders. One Deitemeyer was the designer of the original prototypes and was general manager of Pacific. The business began with a predecessor organization in 1957. Bair manufactured for and sold to Pacific and its predecessor the parts for the various models of loaders in which it dealt. This arrangement continued until about June of 1967 when Bair, for reasons to be discussed later, declined to fill any further orders for Pacific. In or about October of 1967, Bair began the manufacture and sale of loaders substantially identical to the then current models sold by

Pacific. It is undisputed that in the manufacture of the loaders Bair used a number of molds, jigs, reamers, casts, and other devices collectively referred to as "tooling" which had been designed and made for the purpose of and actually used in the manufacture of the loader parts sold by Bair to Pacific. It is also undisputed that when Bair in 1967 commenced manufacture and sale for its own benefit it used parts from the inventory it had manufactured for later sale to Pacific. Pacific, in the latter part of 1967, began the design of new loaders and in 1968 began marketing the new models. Pacific claims damages because Bair in 1967 refused to fill its orders for parts and then went into production for itself, using tooling at least some of which was the property of Pacific. Pacific claims that it is this tooling and the prints of drawings of the product parts that constitute the trade secrets Bair unlawfully used. It also apparently relies to some extent upon a claim that Bair owed a contractual duty to continue to manufacture and sell parts to Pacific, at least until it was able to get its new models on the market. Pacific introduced evidence tending to show that Bair's failure to honor its orders for parts in 1967 and Bair's competing sales on and after October 1967 caused it substantial loss of sales. It prayed for damages in the amount of $508,583 on account of Bair's alleged unprivileged use of the trade secrets.

The trial court, in addition to its general finding for the defendants in the judgment of dismissal, stated in a letter opinion that it found there existed no trade secrets because "whatever advantage had been built into the particular tools was the result of the joint efforts of both parties. Hardly a case of trade secrets imparted from one to the other under a confidential relationship," and that in any event damages were not proved with sufficient certainty.

The evidence relating to some of the contentions of each party is conflicting. Much more of it is clouded

with uncertainty and witnesses in several instances contradict themselves on what would appear to be significant points. These conflicts, uncertainties, and contradictions relate primarily to three areas. In 1960 the parties attempted to negotiate a written contract to replace one under which they had earlier operated. A "final draft" of this contract was prepared but never executed. The parties contest in this court the extent to which the contract became embodied in an oral agreement and the extent to which its provisions governed and controlled the rights of the parties. The trial court, in its letter opinion, stated: ". . . the parties pretty well concede that they did accept Exhibit 82 (the final draft) except for Paragraph 4, which would prohibit defendants from manufacturing loaders for a competitor." Later comments by the court in the letter opinion, however, indicate it understood that the scope of diverse contentions was much wider than as stated in the quotation above.

The second important area of conflict relates to ownership of tooling and prints. The third is the extent to which Bair actually contributed to the developments of improvements in the loaders by reason of his assistance in design and improvements.

Pacific seems to contend that the failure of the trial court to make specific findings with reference to the ownership of tooling constitutes error of law which prevented Pacific from having a fair trial. As we understand it, this argument implies that findings by the court on certain specific matters in effect negate the general finding for Bair which appears in the judgment. This is not the rule.

Neither party in this case requested the trial court to make specific findings and to separately state conclusions of law as they might have done under the provisions of section 25-1127, R. R. S. 1943. That statute provides in part: ". . . it shall not be necessary for the court to state its finding, except, generally, for the plaintiff or

defendant, unless one of the parties request it." Where no section 25-1127 request has been made, the correct rule is: If there is a conflict in the evidence, this court in reviewing the judgment rendered will presume that controverted facts were decided by the trial court in favor of the successful party and the findings will not be disturbed unless clearly wrong. Wallace v. Insurance Co. of North America, 162 Neb. 172, 75 N. W. 2d 549. A general finding that the judgment should be for a certain party warrants the conclusion that the trial court found in his favor on all issuable facts. Mueller v. Keeley, 165 Neb. 243, 85 N. W. 2d 309. We do not believe that these rules are made inapplicable merely because in addition to the general finding the trial court also mentioned certain matters specifically. Accordingly, we must discuss briefly the areas of conflict and the evidence with relation thereto to determine whether the trial court was clearly wrong on some vital issue requiring reversal. Before so doing, clarity will be aided by discussing in more detail the legal principles which are applicable.

Restatement, Torts, section 757, page 5, defines trade secret as follows: "b. Definition of trade secret. A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information in a business (see § 759) in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process or device for continuous use in

the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.

"Secrecy. The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

The commentary then goes on to point out that the

novelty essential to patentability is not necessary in order for a device or process to be a trade secret. The comment states: "The protection is merely against breach of faith and reprehensible means of learning another's secret." Restatement, Torts, § 757, p. 7. In discussing the use of trade secrets the commentary also says: ". . . a manufacturer who is permitted by the owner of the secret to use it in his manufacturing may be subject only to a duty not to disclose the secret to third persons. Or the manufacturer may be permitted to use the secret only in the manufacture of products for the owner, with a duty not to disclose the secret or use it in the manufacture of products on his own account or for others." Restatement, Torts, § 757, p. 8. Comment d, Restatement, Torts, § 757, p. 9, is in part as follows: "A privilege to disclose or use another's trade secret may arise from the other's consent or from other conduct on his part by which he is estopped from complaining." With reference to the matter of breach of confidence under clause b, the comment states in·part: "A breach of confidence under the rule stated in this Clause may also be a breach of contract which subjects the actor to liability under the rules stated in the Restatement of Contracts. But whether or not there is a breach of contract, the rule stated in this Section subjects the actor to liability if his disclosure or use of another's trade secret is a breach of the confidence reposed in him by the other in disclosing the secret to him." Restatement, Torts, § 757, p. 13.

Pacific, in addition to reliance on unprivileged use of trade secrets, places considerable reliance upon such authority as Kamin v. Kuhnau, 232 Ore. 139, 374 P. 2d 912, where the court said: "It has been noted that the 'tendency of the law, both legislative and common, has been in the direction of enforcing increasingly higher standards of fairness or commercial morality in trade.' 3 Restatement, Torts, Introductory Note to ch 35, p 540. The cases adopting the higher standard of 'commercial

morality' emphasize the breach of the confidence reposed in the defendant, rather than the existence of the trade secret." The court also said: "Whether the information disclosed was intended to be appropriable by the disclosee will depend upon the relationship of the parties and the circumstances under which the disclosure was made. It is not necessary to show that the defendant expressly agreed not to use the plaintiff's information; the agreement may be implied. And the implication may be made not simply as a product of the quest for the intention of the parties but as a legal conclusion recognizing the need for ethical practices in the commercial world." In the cited case plaintiff had an idea for an improved garbage packer. He hired the defendant to help him with the mechanics of making a prototype. When that was accomplished and defendant had been paid for his work, defendant immediately began to manufacture the packer and sell it on his own account. The court granted equitable relief in the form of a permanent injunction. Pacific also cites Atlantic Wool Combing Co. v. Norfolk Mills, Inc., 357 F. 2d 866, where the court said: "In general, essence of wrong involving trade secret appropriation is obtaining of unjust enrichment and unfair competitive advantage through inequitable conduct, usually breach of confidence."

We have no quarrel with the holdings of the above and other similar cases cited. However, as our later discussion of the conflicting evidence will show, a finding in the present case that there was such a confidential relationship between the parties as necessitates a "legal conclusion" of an "implication" of a promise not to use the alleged "secrets" or a promise not to compete is not required.

The final draft of the 1960 "agreement" and the deliberate failure of the parties to sign it is significant in characterizing the relationship of the parties as confidential or not. That agreement, had it been adopted by the parties, would have been definitive of their respective

rights in this matter, except that it contained no express provision relative to ownership of tooling. It would, by implication at least, require that Bair furnish all tooling. That draft provided that Pacific would buy from Bair all its requirements for loaders from the date of the contract to July 1, 1970. It provided a means for determination of price. It prohibited Bair from using the trade names "Pacific" and "Deitemeyer." It provided that after termination of the agreement, Bair could not, for a period of 3 months sell any of the products to a competitor of Pacific. It bound Pacific not to buy from any other manufacturer and permitted Bair to terminate the agreement if it did. It provided that upon termination of the contract for any cause Pacific would purchase Bair's inventory of loader parts, but not to exceed a certain quantity, and gave Pacific the right to purchase all such inventory during a period of 3 months after termination. After that time, Bair would have the unrestricted right to manufacture and sell reloading equipment and accessories, except that it could not use the trademarks "Pacific" or "Deitemeyer." This proposed agreement provided that if the parties jointly developed new patentable products, any such patents, if issued, would be jointly owned. There were many other provisions which it is not helpful to note. The contract under which the parties had operated previous to 1960 provided that Bair would construct the tooling necessary to manufacture the parts, Pacific would pay the costs thereof, and title would vest in Pacific. The ownership of tooling built under this first contract is apparently not at issue here.

The evidence is in dispute as to whether the 1960 "agreement" controlled the relations of the parties in any degree from 1960 to 1967. Pacific pled that Bair "produced and sold parts for Deitemeyer loaders and accessories to Pacific Gun Sight Company under an arrangement which was controlled by an agreement substantially in accordance" with the 1960 final draft "al-

though neither party at this time can produce an executed copy." The testimony of Pacific's witnesses was that Pacific was in agreement with all parts of the contract except paragraphs 4 and 15 which included the provisions regulating the rights of Bair to manufacture for others and except paragraph 20 relating to cancellation. They testified that Bair's disagreement on these points was the reason the contract was not signed. Pacific's evidence fails to make clear whether the balance of the contract was intended as the contract although not signed, or whether, because of the failure to agree upon certain items the contract, whatever it may have been, was wholly oral. The effect of Bair's testimony was that it was operating without a written contract and that even those contract terms as to which there was no dispute were not to take effect because Bair did not agree on the provision re ownership of prints. The reason for the objection was because "We just didn't want to make it real easy for them to go somewhere else for a manufacturer in view of the fact that he was under the impression we didn't have a contract."

Nonetheless, despite the inability of the parties to agree in writing, Bair began manufacturing for Pacific. Bair made or caused to be made the tooling necessary to construct the loader parts. Bair billed Pacific for tooling and "setup charges" which Pacific paid. Except in a few instances, billing left uncertain the matter as to where ownership of the tooling lay. Bair testified that when he billed for less than the complete cost of tooling, including profit, that he retained ownership; he said it was the same way when he made only a setup charge. Ideas for changes and improvements in the models came from Pacific, from Pacific's customers through Pacific, and from Bair himself, as new models were designed and new tooling was made and acquired. Bair testified that when original tooling wore out, he replaced it without charge and he considered that he owned such replacement tooling. Some tooling fitted

only his machines and would be useless to anyone else. He considered such tooling to be his also. In about 1966 Bair considered selling his business. He made a list of all tooling which was in his plant at the time and indicated on this list the ownership of tooling, including that which was obsolete. This list indicated that tooling on some models was owned by Pacific, some by Bair, and in many cases, different pieces of tooling necessary to construct the same model where listed as owned some by Bair and some by Pacific. On the basis of this list, Pacific, in 1966, purchased an insurance policy on tooling owned by it and in the possession of others. Bair's claims of ownership are at least in some respects inconsistent with his acknowledgment of ownership in Pacific as indicated by the list which he made. Bair explained this inconsistency by stating that this list was prepared only to protect Pacific if the contemplated sale of his business went through. The list's purpose was not to indicate true ownership, but to exclude certain tooling from the sale in the event the new owner would not manufacture for Pacific. Pacific, to support its claim of ownership, introduced billings made to it by Bair for tooling and which billings had been paid by Pacific. The sale of the business which Bair contemplated in 1966 did not occur. The foregoing summary of evidence and contentions can be said to indicate that evidence was in dispute as to who owned tooling and cannot be decided as a mere matter of law.

In 1966 and 1967 Pacific complained many times to Bair over lack of quality control. In February 1967 Pacific asked one William Pearson, a former Bair engineer, then employed by another firm, if he was interested in working for Pacific. Pearson's testimony was that Deitemeyer, Pacific's manager, said: ". . . he would like to hire me and go into manufacturing and get rid of Bair." This testimony is uncontradicted. Pearson told Bair of the offer of employment. Bair then informed Pacific that if it hired Pearson he would not continue to

manufacture for the company. In May 1967 Pearson went to work for Pacific and worked for it until February 1968. At the time of trial he was working for Bair.

The evidence tends to establish that Bair was worried about Pacific going into manufacturing or getting someone other than Bair to manufacture for it. The evidence also indicates that Pacific was apparently Bair's principal customer and that he had purchased machines and borrowed money in reliance upon the prospect of continued business with Pacific. Bair testified that when controversy arose in 1967 he had attempted to get a firm contractual commitment from Pacific but that he was unsuccessful. Various negotiations took place between the parties. These negotiations failed with the results we have earlier mentioned.

On this conflicting evidence the court could well have concluded that no confidential relationship existed between the parties because Bair insisted upon ownership of the prints of the product; that the right of Bair to manufacture the identical product for others was left open because of the failure of the parties to agree upon paragraph 4 of the 1960 agreement which would have placed limited restrictions upon Bair's right to manufacture the product for himself or others; that Pacific was unwilling to agree that Bair could manufacture its products for any definite period and that the manufacturing arrangement was terminable at will; that Bair made substantial investments in reliance upon the prospect that he would have Pacific's business for a considerable period of time and that Bair was as much dependent upon Pacific as Pacific was upon Bair; that Pacific intended to go into the manufacturing business for itself and "get rid of Bair" with resultant financial loss to Bair; and that with minor exceptions the tooling belonged to Bair.

We cannot say that the judgment of the trial court was clearly wrong.

AFFIRMED.