GARNER TOOL & DIE, A CORPORATION, APPELLANT, V.
JOHN LAUX AND FARELL RAKOWSKI, DOING BUSINESS AS
LINCOLN MACHINE AND MARINE, APPELLEES.

285 N. W. 2d 219

Filed November 13, 1979. No. 42220.

Baylor, Evnen, Baylor, Curtiss & Grimit, for appellant.

Theodore L. Kessner of Crosby, Guenzel, Davis,. Kessner & Kuester, for appellees.

Heard before KRIVOSHA, C. J., CLINTON, and WHITE, JJ., and STANLEY and GITNICK, District Judges.

STANLEY, District Judge.

This is an action in equity for the wrongful use of confidential information and trade secrets. Plaintiff seeks both money damages and injunctive relief. Trial was to the court which found for the defendants, and dismissed the plaintiff's petition. The plaintiff appeals, contending the trial court erred in failing to find that the defendants misappropriated and wrongfully used confidential trade secrets adequately protected by the required element of secrecy. We affirm the judgment of the trial court.

In appeals in equity from the District Court to the Supreme Court, this court reviews the issues by trial de novo on the record. Shirk v. Schmunk, 192 Neb. 25, 218 N. W. 2d 433.

Garner Tool & Die is a products manufacturer and

toolmaking concern. Part of its business is designing tools or processes to produce a specific product. It is owned principally by Ed Garner, a journeyman tool and die designer. Defendants Laux and Rakowski were employed by Garner for several years prior to 1972 as tool and diemakers. Then both defendants quit and started their own business known as Lincoln Machine and Marine. Prior to trial Rakowski and Laux dissolved their partnership. Laux continued in the machine shop, and Rakowski went into the marine business.

In 1969, while Laux and Rakowski were still working for Garner, Goodyear Tire and Rubber Company contacted Garner and requested that he develop processes to sharpen carbide knives and to punch holes in rubber stretch bands. Garner designed the tools and dies, Laux helped build the fixtures, and within 2 weeks Garner began to perform the requested service for Goodyear.

In 1975, 3 years after the defendants left Garner's employ, Laux began sharpening knives and punching holes in stretch bands for Goodyear. Thereafter, Goodyear awarded bid contract orders to both Laux and Garner. However, at the time of trial Garner was no longer sharpening knives, but was punching stretch bands. It is undisputed that both Garner and Laux used identical processes for this work, and that Goodyear was their only customer. As a result of this competition, Garner started this action alleging that Laux, by virtue of a confidential employer-employee relationship, was under a duty not to disclose or use certain information gained in the course of his employment. The issues are whether the processes, sharpening carbide knives and punching holes in rubber stretch bands, were trade secrets constituting confidential information of the plaintiff, and whether they had been wrongfully appropriated by the defendants.

The trial court, in finding for the defendants, found

that the dies utilized by Garner for punching holes in rubber stretch bands had been sold to Goodyear or its customers, and had become public knowledge. Therefore, no claim of a trade secret could be made. The trial court further found that, as to the sharpening of carbide knives, the tools and dies constructed by both Garner and Laux for this purpose utilized many general principles known throughout the tool and diemaking craft and thus did not constitute a trade secret. In addition, the court found that Garner did not maintain the required element of secrecy throughout the entire knife sharpening process.

Restatement, Torts, § 757, p. 5, defines trade secrets. "*Secrecy*. The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret."

In 55 Am. Jur. 2d, Monopolies, Restraints of Trade, and Unfair Trade Practices, § 704, p. 28, it is stated in part as follows: "The elements of a cause of action for misappropriation of a trade secret are: (1) The existence of a trade secret or secret manufacturing process; (2) the value and importance of the trade secret to the employer in the conduct of his business; (3) the employer's right by reason of discovery or ownership to the use and enjoyment of the secret; and (4) the communication of the secret to the employee while he was employed in a position of trust and confidence and under circumstances making it inequitable and unjust for him to disclose it to others or to use it himself to the employer's prejudice." Section 705, p. 29, states in part: "A trade secret must be a particular secret of the complaining employer, and not the general secrets of the trade in which he is engaged." Section 706, p. 29, states in part: "A trade secret is something known

to only one or a few, kept from the general public, and not susceptible of general knowledge. If the principles incorporated in a device are known to the industry, there is no trade secret which can be disclosed. * * * The nature of a trade secret is such that so long as it remains a secret it is valuable property to its possessor, * * * a public sale of the article or description of the article in literature available to the public — destroys the secret.''

In Henkle & Joyce Hardware Co. v. Maco, Inc., 195 Neb. 565, 239 N. W. 2d 772, this court held, ''Some factors to be considered in determining whether given information is one's trade secret are: (1) The extent to which the information is known outside his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and his competitors; (5) the amount of effort or money expended by him in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.''

A review of the testimony and exhibits follows. Garner testified that operation of the processes in issue was conducted in the rear area of his shop; that if any people, other than employees, were in this area they were always escorted; and that Laux and Rakowski operated and were familiar with the equipment. Garner stated the processes he designed and developed were unique; that he had not seen such fixtures in any other shop, catalog, or commercial handbook on tool and diemaking; that he recouped his developmental costs in the unit price charged to the customer; and that both Laux and Rakowski were competent journeyman tool and diemakers when they left his employ.

On cross-examination Garner admitted having seen this process in other plants. When he con-

structed the die sets for punching holes in bands, he purchased some of the component parts and fabricated other parts. He sold some punch dies to Goodyear and their customers, but there were no patents on either process.

Witness William Boyden testified that an experienced tool and diemaker could, simply by observing the fixtures used in both processes, build identical parts; that a commercial grinder could be adapted to sharpen the knives by adding an additional holding clamp; and that the floating punch, used by Garner for punching holes in stretch bands, is illustrated in a textbook on basic diemaking.

Defendant Laux testified that he had worked for Garner for about 18 years, and that he did not have an employment contract containing a covenant restricting him from competition. Also, there was no agreement between him and Garner regarding competition when he left his employment. He had assisted Garner in developing both processes. The grinding fixture took approximately 20 hours to make and its cost was about $360. The dies used to punch stretch bands cost about $1,850, which was recovered when the specimen die was sold to Goodyear. In this sale Garner recovered its costs and made a profit. About 3 years after he left Garner's, Laux contacted Goodyear and advised them he was now operating a machine shop. Goodyear sent him a price quotation form to bid on the knife sharpening and punching of stretch bands. He was awarded some work and in 1975 and 1976 received about ½ of the total Goodyear order. In 1977 he received all of the knife sharpening orders under the process governed by Goodyear specifications. The floating punch dies used by Garner, those owned by Goodyear and its customers, would all fit into his fixture for punching holes in stretch bands. There are several kinds of universal grinders available to sharpen knives, and on any of them all that has to be added

is a clamp to hold the knife to the grinding wheel.

On cross-examination defendant Laux stated he was acquainted with Goodyear's engineers when he worked for Garner and he knew Goodyear was the only customer of Garner's for these two processes, both of which were handled in the production area where lesser-skilled employees performed this work. The die for punching holes in stretch bands, exhibit 11 offered by Garner, bore the words "Property of Xerox," denoting that Garner had sold the die. Exhibit 28, the Goodyear file on tooling it owned, listed at least 12 punching dies made by Garner and sold to Goodyear or its customers, as shown by the invoices. The dies sold for various prices up to $1,850 each. The purchase orders for the dies made by Garner and sold to Goodyear all state language substantially as follows: "Above originally manufactured on P. O. 16912 and is being retained on hand at vendor's [Garner's] shop for future use in punching Xerox part number 23P-224 until recalled by Goodyear." The same exhibit 28 indicates the dies for punching stretch bands used by Laux are also the property of Goodyear, bought by them and left at Laux' shop until called for by Goodyear. Exhibit 25, the elementary textbook for tool and diemakers entitled "Basic Die Making," demonstrates the method ordinarily used in the punching process. Evidently, such information is a matter of public or general knowledge in the diemaking craft.

Laux contends he has a right to use his learning, training, and experience to pursue his craft. He cites Annotation, 43 A. L. R. 2d 105: "In the absence of any agreement between employer and employee to the contrary, the general rule is that an employee, after his term of service has expired, is entitled to compete in business with his former employer. Accordingly if an employee does not bind himself by contract to refrain from entering the services of a competitor after termination of the employment, the

employee violates no duty to his former employer in so doing. Thus, unless restricted by some agreement with his former employer, the employee's right to compete in business with such former employer is the same as that of a stranger to the contract of employment, subject to the qualification that a former employee is precluded from using for his own advantage, and to the detriment of his former employer, information or trade secrets acquired by or imparted to him in the course of his employment. Aside from this limitation, the employee, after the termination of his contract of employment, may seek the patronage of his former employer's customers; and in so doing he may make use of information which he gained in the course of the employment.'' Any form of postemployment restraint reduces the economic mobility of employees and limits their personal freedom to pursue a preferred course of livelihood. The employee's bargaining position is weakened because he is potentially shackled by the acquisition of alleged trade secrets; and thus, paradoxically, he is restrained, because of his increased expertise, from advancing further in the industry in which he is most productive. Moreover, society suffers because competition is diminished by slackening the dissemination of ideas, processes, and methods.

In substance Laux maintains that Garner, in selling the specimen die for punching rubber stretch bands, lost all protectable interest therein, and that the grinding fixture for sharpening carbide knives is a matter of general knowledge of the tool and die-making craft and is not a protectable trade secret. We agree.

The judgment of the trial court is affirmed.

AFFIRMED.