SELECTION RESEARCH, INC., A NEBRASKA CORPORATION, APPELLANT AND CROSS-APPELLEE, V. MICHAEL MURMAN ET AL., APPELLEES AND CROSS-APPELLANTS.

433 N.W.2d 526

Filed January 6, 1989. No. 87-169.

Michael O. Johanns, of Peterson Nelson Johanns Morris & Holdeman, for appellant.

Paul M. Schudel, of Woods, Aitken, Smith, Greer, Overcash & Spangler, for appellees.

BOSLAUGH, WHITE, CAPORALE, and SHANAHAN, JJ., and JAMES MURPHY, D.J.

CAPORALE, J.

Plaintiff-appellant and cross-appellee, Selection Research, Inc., a Nebraska corporation, seeks to enjoin defendants-appellees and cross-appellants, Measurement Systems Corporation, a Nebraska corporation, and its organizer and operator, Michael Murman, from using alleged trade secrets assertedly belonging to Selection Research and from engaging in allegedly deceptive trade practices, and to recover damages. In a bifurcated trial, the district court found in favor of Selection Research and permanently enjoined defendants from, in summary, using or disclosing certain interview procedures, scoring methods, and techniques of analysis, and from designing, developing, or marketing certain personnel selection processes. The injunction also ordered defendants to return certain documents to Selection Research.

At the subsequent phase of the trial, the district court determined Selection Research had failed to prove damages and, on its own motion, narrowed its prior injunction by striking that portion which related to future development of personnel selection processes. Selection Research's assignments of error on appeal to this court combine to complain of the district court's (1) determination as to damages and (2) narrowing of its earlier injunction. The defendants' assignments of error on their cross-appeal meld to assert that the district court erred in (1) finding generally in favor of Selection Research and enjoining defendants as aforesaid and (2) purportedly reinstating a certain "Trade Secret Agreement" between Murman and Selection Research. For the reasons hereinafter stated, we determine the trial court erred in finding in favor of Selection Research, and therefore reverse its decree, vacate its injunction, and dismiss the action.

## I. METHOD OF REVIEW

Defendants' cross-appeal questions the sufficiency of the evidence to support the district court's injunction, a contention which presents issues logically prior to the question of damages. Thus, we shall first review the salient facts of record, touching upon defendants' alleged misappropriation of Selection Research's purported trade secrets and their alleged deceptive trade practices.

## II. EVIDENCE

Selection Research engages, among other things, in the business of assisting employers in making hiring judgments, work which is referred to as personnel selection. In Selection Research's lexicon, an "indepth interview," or "indepth," is a structured interview composed of questions developed by studying a "focus group" of successful persons. These questions are posed to a job candidate in a certain order, hence the term "structured interview," and are intended to tap "themes" common to the successful persons studied. Job candidates' responses to these questions are evaluated based on the presence of certain answers, called "listen fors," which have been statistically correlated with success in a given endeavor, such as sales. Selection Research maintained at trial that consistency in the order of question presentation and in the

wording of individual questions is vital; without this consistency, an instrument, that is, the interviewing process, cannot be said to perform its task.

The method of "instrument" development is widely known among practitioners in the field, having been described in several magazine articles and a master's thesis publicly available at the University of Nebraska library. Murman testified that he referred to these published articles in developing the "Miller instrument" interview process, which is the focus of contention in this case and about which more is written later.

Dr. Donald Clifton, chief executive officer and one of the founders of Selection Research, testified that prior to the incorporation of Selection Research, he had, for 20 years, while employed at the University of Nebraska, engaged in psychological research contributing to the development of his indepths. During these development years, he shared information on his work with colleagues and students. Clifton's research was influenced by the published works of Carl Rogers, Gordon Allport, Gallup, Leighton, Bruner, Murphy, and Hunt. By the time Clifton started Selection Research in 1969, he had already developed the sales and management indepths and had made progress on the teacher indepth.

Around 1970, Selection Research started to develop another class of instruments, called "perceivers." Although both indepths and perceivers are based on the same questions and listen fors, indepths are administered by Selection Research personnel, whereas perceivers are administered by Selection Research clients. Perceivers are scored somewhat differently than indepths. There is essentially only one perceiver form, which Selection Research repackages for each client. While perceiver forms contain a listing of listen fors, only trained Selection Research personnel have access to indepth listen fors, which have never, except as involved in this lawsuit, been put in writing but which are taught to Selection Research personnel in the course of training. In Clifton's words, "so you can put your name on a report at [Selection Research] you have to do a minimum of 500 analyses under supervision and it's at that time that all the subtleties of the indepth are learned. That's why the indepth is a more powerful instrument."

In addition to indepths and perceivers, Selection Research has also developed for limited use a class of instruments called "screeners," which are essentially abbreviated perceivers intended to be administered and interpreted by Selection Research clients themselves. At least one Selection Research client developed a screener for itself. Selection Research has also composed questions for print advertisements soliciting job applicants for its employer clients. Questions used for this purpose are similar, but not identical, to questions used in indepths and perceivers.

According to various Selection Research witnesses, if the specific questions or the associated listen fors of a Selection Research instrument become public knowledge, the instrument is rendered valueless, causing economic loss to Selection Research. However, Dr. Douglas Rath, a member of the board of directors of Selection Research, testified that Selection Research's instruments had not been compromised in this way by defendants.

Since August 1969, Selection Research has sought to maintain the confidentiality of its work through the use of trade secret agreements. Murman, as a former employee of Selection Research, signed such an agreement on December 18, 1981. That agreement professes, in summary, to forever bar Murman from using or disclosing anywhere or to anyone any information concerning Selection Research's system, clients, prospective clients, prices, or any other information concerning its business, manner of operation, plans, processes, procedures, or techniques. In this connection, it is interesting to note that Clifton testified as follows:

> Q. And do you have an opportunity to visit from time to time with your competitors about instruments that they might be using?
>
> [Clifton] I don't see competitors that often or at least I don't see them as competitors from what I can think. I was at a meeting and we shared a meeting with the person who developed or worked on developmental dimensions and that was one where we shared some ideas.

Linda Naticchioni, a former employee of Measurement Systems and one-time defendant in this action, had access to

Selection Research materials while employed at Selection Research, as did Murman. Murman removed no documents from Selection Research when he left its employ; Naticchioni, however, removed a "co-worker perceiver manual" pursuant to Clifton's permission. Neither Murman nor Naticchioni has acquired any Selection Research materials since leaving its employ. Dr. Gary Hoeltke, Selection Research's supervisor of security and coordinator of legal matters, testified, however, that by "the very nature of the position [Murman and Naticchioni] were in, they learned a great deal from [Selection Research]. Now, everything they learned virtually from definition would have been taken with them when they left. Now, tangible, no. But learning, definitely, yes."

While employed at Selection Research, Murman was trained in the use and interpretation of indepths, learning the methods of both administration and analysis, including listen fors. Murman was also trained in the use of Selection Research perceivers. In fact, Naticchioni herself appears to have trained Murman in the use of the sales perceiver. Rath testified:

The training is [Selection Research's] product in terms of how [one in the possession of Selection Research's questions] could make the interpretation, in terms of the validity of the process.

. . . The learning of the listen fors of either the perceiver or the indepth is the product that we offer to our clients and [Murman] worked with some of the largest clients that we have and people that we've worked with the longest that are most important to us in terms of our revenue. . . .

He was skilled in the analysis. . . .

As a Selection Research employee, Naticchioni trained her employer's clients in the use of perceivers; however, she was never involved in developing or customizing a perceiver. During her first year at Selection Research, Naticchioni occasionally administered indepths. At such times, she was allowed to do so outside the presence of a supervisor. She never participated in the analysis or construction of an indepth, nor has she used one

since leaving Selection Research.

J.R. Miller Co., Inc., had been a Selection Research client whose employees Naticchioni had trained in the use of the Selection Research perceiver. Because of a dispute between Miller Co. officials and Selection Research officers, but not involving defendants, Miller Co. determined to terminate its relationship with Selection Research. Naticchioni left Selection Research to pursue other interests in March 1982; this venture ended in May 1983. Shortly thereafter, in the summer of 1983, Miller Co. asked Naticchioni, individually, for her help in recruiting managers for its franchise restaurants. Naticchioni agreed, and at the time of trial was still involved in recruiting management prospects for Miller Co. In this capacity, and as an employee of Measurement Systems, Naticchioni used interview and teaching skills she learned at Selection Research.

Murman formed Measurement Systems in August 1983, several weeks after he left Selection Research. From August to December 1983, Measurement Systems' income was derived principally from personnel selection work on behalf of its employer clients. In accomplishing this activity, Murman struck an agreement with one Ed Ryan, a Selection Research competitor based in Chicago, for licensed use of Ryan's selection instruments. Rath testified that many of Ryan's "items are exact or similar [to Selection Research questions] as well as are the listen fors, the questions and the listen fors."

In the fall of 1983, Miller Co. expressed to Naticchioni a desire to develop its own in-house personnel selection instrument. Later, when Naticchioni joined Measurement Systems, she and Murman proposed assisting Miller Co. in this endeavor. Miller Co. accepted Measurement Systems' proposal, and development work commenced, during the course of which Measurement Systems studied a "focus group" of eight persons. Over several months of research, Murman and his associates gathered materials in addition to those obtained from Ryan and used these resources, as well as information gleaned from Miller Co. itself, in developing for Miller Co. a personnel selection interview process which became known as the Miller instrument.

The first draft of the Miller instrument contained 107

questions, with listen fors associated with each question. The questions of which this draft of the Miller instrument was composed are similar to questions found on various Selection Research instruments which predate the Miller instrument. The listen fors associated with Measurement Systems' Miller instrument resemble certain Selection Research indepth listen fors in various Selection Research instruments. Certain items of Measurement Systems' promotional and interpretative literature also resemble analogous Selection Research documents. Hoeltke engaged in the following colloquy with defendants' counsel:

> Q. Dr. Hoeltke, do you know of any instances that have occurred where either Measurement Systems or Mrs. Naticchioni or Mr. Murman have tried to or have actually represented they or Measurement Systems to be a part of or in some way affiliated with Selection Research?

> [Hoeltke] I have been informed by colleagues at [Selection Research] that we have received calls from clients asking what is going on because they have received sales calls from others that were marketing materials extremely similar to us, to [Selection Research] but that would be to the extent to which I would be aware of that.

According to Naticchioni, she and Murman wrote the final 39 questions of the Miller instrument draft; the first 68 questions were "pre-existing." Murman testified that 10 to 15 of the preexisting questions were taken, with permission, from the Ryan materials, and several more were slightly modified versions of Ryan questions.

Following completion of the draft Miller instrument, Murman and Naticchioni administered the resulting 107-question interview to 12 selected Miller Co. managers by phone, and submitted the results, together with performance data on each of the 12 subjects, to Dr. David Johnson, who performed statistical analyses of the data. Johnson then conferred with Murman regarding the validity of the instrument and of the various questions, and a 73-question revised instrument was prepared. This 73-question version constitutes the final draft form of the Miller instrument.

Dr. Gene Glass, Selection Research's expert on psychological

test construction and statistics, testified that the process Murman said he used to create the Miller instrument "is common in the field," being described in articles or textbooks. According to Glass, it is "the product of the process, the instrument created that has the unique features." Rath admitted that the process whereby Selection Research derives questions and listen fors is not a trade secret; he asserted, instead, that the questions and listen fors themselves comprise Selection Research's trade secrets. According to Rath, Murman's experience at Selection Research "helped him understand the whole analysis process in terms of how we analyze people."

Glass stated that the development of instruments like Selection Research's indepths and perceivers would take "five years minimum, very likely, and hundreds of thousands of dollars"; in Glass' opinion it is highly unlikely that research on as few as eight people could produce a valid personnel selection instrument.

Unlike Selection Research's indepth and perceiver materials, Measurement Systems' Miller instrument incorporates computer diskettes containing training and scoring software developed by Measurement Systems. As Naticchioni explained it, "We have a real sophisticated program that's been written specifically for the [Miller] company and there are specific adaptations that have been made for them that help them to learn along the way."

According to Murman, Measurement Systems' selection work is similar to Selection Research's in that "[b]oth processes are a patterned interview using structured questions that are open ended. There is a guideline for listen fors and they both use the same method of keeping the data which is transcribing tape recordings." Nevertheless, Naticchioni maintained at trial that "[w]e weren't you know, trying to do anything that was copying anybody else. We were interested in building our own interviews and using the knowledge that we had obtained through our experience in working with the JR Miller Company so we did what we did."

### III. SCOPE OF REVIEW AND QUANTUM OF EVIDENCE

We begin our analysis of the legal issues presented by the

summarized assignments of error by recalling that an action for injunction sounds in equity. See, e.g., *Johnson v. NM Farms Bartlett*, 226 Neb. 680, 414 N.W.2d 256 (1987); *Hughes v. Enterprise Irrigation Dist.*, 226 Neb. 230, 410 N.W.2d 494 (1987); *Garner Tool & Die v. Laux*, 204 Neb. 717, 285 N.W.2d 219 (1979). In an appeal of such an action, this court tries the factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; provided, where the credible evidence is in conflict on a material issue of fact, we consider and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *First Fed. Sav. & Loan Assn. v. Thomas, ante* p. 465, 432 N.W.2d 222 (1988); *Fisbeck v. Scherbarth, Inc.*, 229 Neb. 453, 428 N.W.2d 141 (1988); *Johnson v. NM Farms Bartlett, supra.* In its de novo review of the record of this case, this court is guided by the rule that a party seeking injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle the claimant to relief. *Hughes v. Enterprise Irrigation Dist., supra.*

### IV. ANALYSIS
#### 1. Trade Secret Claim

With those rules in mind, we move on to a consideration of the elements of a cause of action for misappropriation of a trade secret, which are: (1) the existence of a trade secret or secret manufacturing process; (2) the value and importance of the trade secret to the employer in the conduct of his business; (3) the employer's right by reason of discovery or ownership to the use and enjoyment of the secret; and (4) the communication of the secret to the employee while he was employed in a position of trust and confidence and under circumstances making it inequitable and unjust for him to disclose it to others or to use it himself to the employer's prejudice. *Garner Tool & Die v. Laux, supra.*

As the recitation of the evidence in part II above demonstrates, Selection Research does not make clear exactly what it asserts in satisfaction of the first element of this tort. The parties are in apparent agreement that the process whereby a selection instrument is developed is widely known. As this

court observed in *Garner Tool & Die v. Laux, supra*, the subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as its secret. A trade secret must be a particular secret of the complaining employer and not the general secrets of the trade in which the employer is engaged. A trade secret is something known to only one or a few, kept from the general public, and not susceptible of general knowledge. If the principles incorporated in a device are known to the industry, there is no trade secret which can be disclosed. The nature of a trade secret is such that so long as it remains a secret, it is valuable property to its possessor; a public sale of the article or description of the article in literature available to the public destroys the secret. *Garner Tool & Die v. Laux, supra*. Clearly, the widely known, publicly documented process whereby a personnel selection instrument is constructed and validated cannot be Selection Research's trade secret, and Selection Research apparently claims no such proprietary interest in this process.

Yet, precisely what Selection Research claims as a proprietary interest remains unclear. The evidence suggests that Selection Research's claim of trade secret extends to each of its completed instruments qua instrument; or individually to each of the many questions and listen fors it has developed over the years; or to each question and listen for pair, as both are required for interpretation of a job candidate's responses; or, finally, to the system resulting from the combination of some or all of the foregoing three components.

If Selection Research is indeed claiming a trade secret interest in each of its instruments qua instrument, its claim must fail for the simple reason that a comparison of its instruments with the Miller instrument discloses only superficial similarities insufficient to support Selection Research's implicit allegation that the Miller instrument is a copy of one or more of Selection Research's instruments. Certainly, if Selection Research's and defendants' products differed from one another only in a few words, or by a mere rearrangement of nonfunctional aspects of appearance, this court might well conclude that Selection Research's instruments had been misappropriated, or, more

tersely stated in this instance, copied. However, in light of Selection Research's uncontroverted evidence that the order in which questions are presented and the precise wording of those questions are the backbone of its instruments' value, this court cannot conclude that the Miller instrument, differing markedly as it does in language, organization, and even in question subject matter, is a literal or functional copy of any Selection Research instrument in evidence or discussed in the record. Rather, the Miller instrument seems to bear only a family resemblance to Selection Research's instruments; hardly surprising, given that both Measurement Systems and Selection Research used essentially the same well-known process to develop interviews to perform essentially similar tasks.

If Selection Research is understood to claim a trade secret interest in the various questions and listen fors that make up its instruments, this claim, too, must fail. While a few of Measurement Systems' questions are verbatim or very nearly verbatim duplicates of Selection Research's questions, the latter's contention that Measurement Systems copied Selection Research's questions and listen fors is rebutted by the defendants' contention, supported by the testimony of a member of Selection Research's board of directors, that many of the identical or very similar items were culled from non-Selection Research materials, and Selection Research has not proven itself to have been the source of Measurement Systems' language by the requisite preponderance. Furthermore, none of these questions inquire about any matter so removed in commonsense from the task at hand, that of selecting persons likely to make good franchise restaurant managers, that the resemblance proves anything more than the family resemblance mentioned earlier, albeit made the more suspicious, and perhaps the more likely, by Naticchioni's and Murman's prior acquaintance with Selection Research's uses of language. Nevertheless, without distressing the parties further by disclosing, against their wishes as expressed in repeated joint stipulations both in the district court and in this court, the phrasing of particular questions and listen fors, let us merely point out, by analogy and not by quoting or paraphrasing any question, that the inquiry, "Do you like to work with people?"

may be expressed in few ways more direct, nor should such pointless exercises in variation on a theme be forced upon commercial competitors by the courts of this state. As this court stated in *Garner Tool & Die v. Laux*, 204 Neb. 717, 724, 285 N.W.2d 219, 223 (1979), citing Annot., 43 A.L.R.2d 94 (1955):

> Any form of postemployment restraint reduces the economic mobility of employees and limits their personal freedom to pursue a preferred course of livelihood. The employee's bargaining position is weakened because he is potentially shackled by the acquisition of alleged trade secrets; and thus, paradoxically, he is restrained, because of his increased expertise, from advancing further in the industry in which he is most productive. Moreover, society suffers because competition is diminished by slackening the dissemination of ideas, processes, and methods.

If Selection Research is understood to argue that its trade secret interest resides in associated pairs of questions and listen fors, this claim must also fail for the reason that no such pair of items in the Miller instrument duplicates any pair of such items found in Selection Research items with the precision which Selection Research insists must be present to render such pairs the functional equivalent of one another.

Finally, if Selection Research is understood to claim a trade secret interest in the product or process which results from combining any two, or all, of the discrete parts described earlier, this claim, too, must fail, for the evidence fails to demonstrate how the resulting product or process is unique to Selection Research. In short, the evidence fails to establish that Measurement Systems misappropriated anything that is unique to Selection Research.

### 2. Deceptive Trade Practice Claim

Selection Research also argues, in the language of its operative petition, that "the service presently being provided by the Defendants to its customers is significantly identical to the service provided by [Selection Research] and the Defendants are therefore, in the course of their business, causing likelihood of confusion and misunderstanding . . . ."

Nebraska's Uniform Deceptive Trade Practices Act is found

at Neb. Rev. Stat. §§ 87-301 et seq. (Reissue 1987 & Cum. Supp. 1988). Section 87-302 (Reissue 1987) of that act provides in relevant part,

> (a) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:
>
> . . . .
>
> (2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
> (3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another.

Section 87-303(a) (Reissue 1987) of the act provides, among other things, that one likely to be damaged by a deceptive trade practice may be granted an injunction notwithstanding the absence of proof of monetary damage or intent to deceive.

To resolve this case it is sufficient to note that Selection Research's deceptive trade practice action clearly is not supported in the record. The only assertion of record directed to "confusion" in the marketplace between Selection Research's products and Measurement Systems' products is Hoeltke's compound hearsay statement that he has heard that others at Selection Research have heard that unnamed entities in the marketplace have called "asking what is going on."

### 3. Resolution of Controlling Issues

Thus, our de novo review of defendants' first summarized assignment of error on cross-appeal leads to the conclusion that Selection Research has failed to prove either a misappropriation of its trade secret or a deceptive trade practice. Nor does the record support that portion of the injunction which requires defendants to return documents to Selection Research. So far as the record shows, Murman took no document from Selection Research, and Selection Research, through Clifton, gave Naticchioni the only document she removed from her former employer's premises. The foregoing determinations render unnecessary any consideration of the issues raised by the summarized errors assigned in Selection Research's appeal.

### 4. Trade Secret Agreement

Left for comment, then, is defendants' second summarized

assignment of error, the district court's treatment of the trade secret agreement between Murman and Selection Research described in part II above. Prior to the commencement of the case now before us, and in the course of prior litigation between Selection Research and Murman, those parties, on July 9, 1984, entered into a stipulation reciting that Murman had not to that date violated the terms of the subject document and agreeing that upon order of the district court, the trade secret agreement "shall become void and of no effect between the parties[,] it being the intention of the parties to substitute this stipulation therefor." At trial of the present case, testimony was adduced indicating that during the meeting at which the aforedescribed stipulation was made, Hoeltke was told

> the stipulation applied to Mr. Murman selling computer software materials and that further as a part of that . . . there was a very long list of [Selection Research] clients that were discussed and that that was part of the agreement that those clients would not be contacted and that Mr. Murman would be selling computer software material.
>
> There was at no point reference to [Selection Research] perceivers or indepths or that type of material.

Selection Research relied on Murman's statement that he would not engage in the business of personnel selection in entering into the above stipulation. However, when this stipulation was signed, Murman had already commenced selection work for the Miller Co., a fact which Murman did not disclose to Selection Research at the time.

Noting that the stipulation recited that Murman has not violated the terms of the trade secret agreement, the district court concluded "that the Stipulation, taken together with the statements by Murman, is sufficient to establish fraudulent misrepresentations by Murman by clear and convincing evidence." The district court thus entered an order reciting that the stipulation was set aside and the agreement reinstated.

We observe, however, that Selection Research's operative petition in this case does not allege a breach of the agreement between it and Murman, to which Measurement Systems is not a party. Rather, Selection Research's petition relies upon the common-law tort of misappropriation of trade secrets and the

statutory tort of deceptive trade practices. The only role the agreement plays in this case is evidential in the sense that its existence bears on the care Selection Research affords what it perceives as its trade secrets.

Thus, whatever may be the ultimate import of the district court's treatment of the stipulation and agreement, that treatment has no bearing on the resolution of this present case. Accordingly, we concern ourselves with the matter no further.

## V. DECISION

For the foregoing reasons, the decree of the district court is hereby reversed, its injunction vacated, and the action dismissed.

REVERSED, INJUNCTION VACATED, AND DISMISSED.