RICHDALE DEVELOPMENT COMPANY, A NEBRASKA PARTNERSHIP,
APPELLANT, V. MCNEIL COMPANY, INC., A NEBRASKA
CORPORATION, APPELLEE.
508 N.W.2d 853

Filed December 10, 1993.   No. S-91-814.

Jeffrey A. Silver for appellant.

David D. Ernst and Lisa M. Meyer, of Gaines, Mullen, Pansing & Hogan, for appellee.

HASTINGS, C.J., BOSLAUGH, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ.

HASTINGS, C.J.

Richdale Development Company brought this action against McNeil Company, Inc., seeking injunctive relief and monetary damages based on deceptive trade practices, misappropriation of trade secrets, unjust enrichment, and conversion. Richdale appeals the order of the district court in which the court granted injunctive relief but dismissed Richdale's claims for damages.

An injunction is a remedy available through an equity action. In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; provided, where credible evidence is in conflict on a material issue of fact, an appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *K N Energy, Inc. v. Cities of Broken Bow et al., ante* p. 113, 505 N.W.2d 102 (1993); *Chambers-Dobson, Inc. v. Squier*, 238 Neb. 748, 472 N.W.2d 391 (1991).

McNeil is a Nebraska corporation engaged in the construction of residential and commercial projects in Omaha. Patrick McNeil testified that he was the owner of McNeil and that in 1989 he was approached about the possibility of building an apartment complex at 144th and F Streets. McNeil had not previously constructed an apartment complex, and Patrick McNeil felt it necessary to gather information about the costs involved in this type of project. In late September 1989, he went to the Vanderbilt apartment complex, which was under

construction, in order to do research on construction costs of multifamily units. Patrick McNeil stated that when he went into the Vanderbilt complex, he looked around and saw a set of plans in one of the units. He picked the plans up and took them back to his office. At the time, he did not know who was building the complex and did not ask permission of anyone to take the plans. Patrick McNeil testified: "I shouldn't have taken the plans. It was an error in judgment. I was walking through. There was a plan sitting there; probably shouldn't have been there and I probably shouldn't have taken it."

Patrick McNeil subsequently removed the names of the architects from the Vanderbilt plan, made changes to the window design, and had 20 photocopies made of 9 pages of the plan. He then sent those copies out to subcontractors for preliminary numbers, indicating to them that the project was to be built on Fort Street. Patrick McNeil testified that he never arrived at any conclusion about what it would cost to construct an apartment complex similar to the Vanderbilt. When he heard that he was being sued, he gathered up all the plans and destroyed whatever he had. He tried to contact David Slosburg, a partner in Richdale, the builder of the Vanderbilt complex. Patrick McNeil stated that he believed that Slosburg thought McNeil was going to build from the Vanderbilt plan and that he wanted to tell Slosburg that he was not using the plan in that manner.

Slosburg testified that in 1985, he contacted architect Terry Molik for the purpose of developing plans for an apartment complex in Omaha. Molik designed the plans for Richdale's Lion's Head complex and was paid approximately $37,000 for his services. Based on marketing exposure and feedback from tenants, Richdale revised those plans for the construction of its Vanderbilt complex. Molik was paid an additional $37,000 for his architectural services with respect to the Vanderbilt complex. Slosburg testified that in his opinion, the total cost for the Vanderbilt plans would be $250,000, based on "the input that went into it, the time that went into it, and the competitive advantage as far as — not only has that community been a success but the predecessor design was a success." Slosburg also stated that he would not sell the plans to someone who intended

to use them in the same marketplace as Richdale, but if he sold. them to someone in a different marketplace, it would be at a cost of $125,000. He stated that Richdale had taken steps to protect the integrity of its plans, including numbering each set and requiring deposits and the return of the plans from subcontractors. Although the city of Omaha required a set of plans to be filed in order to issue construction permits, Slosburg stated that he did not intend to place his plans and specifications into the public domain by complying with the city ordinance. Richdale did not attempt to copyright the plans.

The district court found that McNeil's misappropriation of the plans constituted a deceptive trade practice entitling Richdale to injunctive relief, but that Richdale's claims for misappropriation of trade secrets, unjust enrichment, and conversion were preempted by the federal Copyright Act of 1976, 17 U.S.C. § 101 et seq. (1988). Richdale appeals, asserting that the court erred in (1) finding that McNeil's misappropriation of Richdale's plans was preempted by the federal Copyright Act of 1976 and (2) finding that Richdale had not sustained any damages by way of misappropriation, unfair competition, conversion, or unjust enrichment.

Richdale alleges in its amended petition filed January 9, 1990, generally that it is engaged in the design and construction of residential properties in the Omaha area and, to accomplish that end, had retained an architectural firm to prepare blueprints, plans, and specifications for a particular type of apartment building, which items it refers to generally as its "plans." It is further alleged that Richdale took steps to keep the plans in the strictest of confidence and that the plans are valuable trade secrets. Richdale goes on to assert that McNeil, without authority, came into possession of a copy of the plans, erased certain identifying characteristics, and misappropriated the plans with the intent to use them for its own benefit or that of a third party.

The amended petition goes on to state that as a result of the facts alleged, it requests the issuance of an injunction and prays for damages for misappropriation of trade secrets, unjust enrichment as a result of the violation of Richdale's proprietary rights, and conversion.

Neb. Rev. Stat. § 87-302 (Cum. Supp. 1992) of Nebraska's Uniform Deceptive Trade Practices Act provides in pertinent part:

(a) A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, he or she:

(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

Under the provisions of Nebraska's Trade Secrets Act, Neb. Rev. Stat. § 87-501 et seq. (Cum. Supp. 1992), a trade secret is defined as follows:

(4) Trade secret shall mean information, including, but not limited to, a drawing, formula, pattern, compilation, program, device, method, technique, code, or process that:

(a) Derives independent economic value, actual or potential, from not being known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

§ 87-502. Section 87-503 provides for injunctive relief, and § 87-504 allows damages under certain circumstances because of misappropriation under the terms of the Trade Secrets Act.

On the other hand, § 301(a) of the Copyright Act of 1976 provides:

On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

Section 102(a) of the copyright act extends copyright protection to "(5) pictorial, graphic, and sculptural works," which works are in turn defined by that act's § 101, as amended by Pub. L. No. 100-568, § 4(a)(1), October 31, 1988, effective March 1, 1989, which provides: " 'Pictorial, graphic, and sculptural works' include . . . diagrams, models, and technical drawings, including architectural plans."

Thus, state laws are subject to federal preemption under § 301 of the copyright act only when the subject matter of the action is governed by copyright law *and* the scope of the state law is equivalent to the copyright act's exclusive rights as specified by § 106. Architectural drawings and plans clearly "come within the subject matter of copyright" of § 102(a)(5) regarding "pictorial, graphic, and sculptural works," which in turn are defined in § 101, as amended in 1989, to include "diagrams, models, and technical drawings, including architectural plans," which inclusion preempts their coverage by state law.

Original works of authorship, including architectural plans, are within the subject matter of copyright even if the material is not or could not be copyrighted. *Ehat v. Tanner*, 780 F.2d 876 (10th Cir. 1985), *cert. denied* 479 U.S. 820, 107 S. Ct. 86, 93 L. Ed. 2d 39 (1986).

The remaining question is whether the appellant's claims for deceptive trade practices, unfair competition, misappropriation of trade secrets, unjust enrichment, and conversion are equivalent to rights governed exclusively by § 106 of the copyright act. As explained in 1 Melville B. Nimmer and David Nimmer, Nimmer on Copyright § 1.01[B] at 1-12 to 1-14 (1991):

> [T]he reference to Section 106 in the Section 301 phrase "equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106" is by way of identification and not limitation. If a state created right is "within the general scope of copyright" it is subject to preemption, even if the precise contours of the right differ from any of those contained in Section 106. Still, Section 106 may be said to identify the general nature of the rights which fall "within the general scope of

copyright." Such a right must inhere in a work of authorship. It consists of a right to prohibit reproduction ..., performance, distribution or display of such a work. Thus, in essence a right which is "equivalent to copyright" is one which is infringed by the mere act of reproduction, performance, distribution or display. The fact that the state created right is either broader or narrower than its federal counterpart will not save it from preemption. . . . If under state law the act of reproduction, performance, distribution or display, no matter whether the law includes all such acts or only some, will *in itself* infringe the state created right, then such right is preempted. But if other elements are required, in addition to or instead of, the acts of reproduction, performance, distribution or display, in order to constitute a state created cause of action, then the right does not lie "within the general scope of copyright," and there is no preemption.

(Emphasis in original.) Courts must therefore determine if an additional element exists in the state law which "changes the nature of the action so that it is *qualitatively* different from a copyright infringement claim." *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F. Supp. 1523, 1535 (S.D.N.Y. 1985). As noted in *Editorial Photocolor v Granger*, 61 N.Y.2d 517, 522, 463 N.E.2d 365, 367, 474 N.Y.S.2d 964, 966 (1984):

The Copyright Act of 1976 (Pub L 94-553) worked a fundamental change in this Nation's copyright laws. After the effective date of that act, all legal and equitable rights equivalent to copyrights are governed exclusively by that act. States may not, by statute or common law, provide equivalent rights, and State courts are divested of jurisdiction to consider claims to enforce those rights.

Cited in *Editorial Photocolor* was a portion of 28 U.S.C. § 1338(a) (1988), which provides as follows: "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trade-marks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases."

In the instant case, the essence of appellant's claims is the

reproduction and distribution of its architectural plans. Although the appellant here makes a claim for conversion, it is not the appellant's being physically deprived of the plans, but, rather, the appellant's damage resulting from reproduction and distribution which is essential to the claim. Thus, the district court correctly found under the facts of this case that the claim for conversion was preempted by the copyright act.

The district court also correctly found that the appellant's claim for unfair competition was preempted. The appellant cites *Intown Enterprises, Inc. v. Barnes*, 721 F. Supp. 1263 (N.D. Ga. 1989), for the proposition that a state law unfair competition claim is not preempted by the copyright act. In *Barnes*, the plaintiff commissioned a series of architectural drawings and obtained a copyright registration for them. The defendant allegedly made several unauthorized copies of the drawings and subsequently used the copies to construct a house, which he then sold. The plaintiff brought claims for copyright infringement, misappropriation, conversion, intentional interference with business relations, and unfair competition. The court found that the state law claims for misappropriation, conversion, and intentional interference with business relations were preempted. However, the court further found that

> [b]ecause plaintiff's unfair competition claim (Count 4(b)) alleges that the marketing of the house Barnes built from the infringed plans was likely to confuse potential buyers as to whether plaintiff built the house, the court finds that the unfair competition claim is not preempted. *See Donald Frederick Evans* [*v. Continental Homes, Inc.*], 785 F.2d [897,] 914 [(11th Cir. 1986)]; *B.H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254, 1263 (5th Cir. 1971) (unfair competition claim goes to marketing, not copying).

721 F. Supp. at 1267.

In the instant case, the appellee did not *construct* or *market* a building from the appellant's plans, and thus the case may readily be distinguished from *Barnes*. There is no element of consumer confusion in this case which would qualitatively distinguish an unfair competition claim from a claim within the

scope of the copyright act. See, also, *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486 (11th Cir. 1990) (Florida law requires that plaintiff establish deceptive or fraudulent conduct of a competitor and likelihood of consumer confusion in order to prevail on unfair competition claim; in the absence of proof of any element of unfair competition other than copying, claim for unfair competition is clearly preempted).

Some courts have found claims for misappropriation of trade secrets to be exempt from preemption by the federal act. See, e.g., *Southern Miss. Planning & Dev. Dist. v. Robertson*, 660 F. Supp. 1057 (S.D. Miss. 1986) (in case involving computer software, court found that analysis of the interests secured by copyright and trade secret law reveals that claims are not equivalent; protection provided by common law of trade secret misappropriation extends to original, undisclosed ideas of the author, while copyright protection extends not to an idea itself, but, rather, to the author's particular expression of it); *Warrington Assoc. v. Real-Time Eng. Systems*, 522 F. Supp. 367 (N.D. Ill. 1981) (copyright act does not preempt common-law tort claim; common law of both Minnesota and Wisconsin stresses that trade secrets tort is premised on concepts of breach of trust and confidentiality, and not copying).

However, to state a claim for misappropriation of a trade secret, the claimant must allege elements outside the scope of copyright protection: a relationship of secrecy and an actual *trade secret*. In *Selection Research, Inc. v. Murman*, 230 Neb. 786, 795, 433 N.W.2d 526, 532 (1989), this court examined the elements necessary to establish a cause of action for misappropriation of a trade secret, which elements are:

> (1) the existence of a trade secret or secret manufacturing process; (2) the value and importance of the trade secret to the employer in the conduct of his business; (3) the employer's right by reason of discovery or ownership to the use and enjoyment of the secret; and (4) the communication of the secret to the employee while he was employed in a position of trust and confidence and under circumstances making it inequitable and unjust for him to disclose it to others or to use it himself to the employer's

prejudice.

We further noted that the subject matter of a trade secret must be *secret*, that matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as its secret, and that a trade secret is something known to only a few and not susceptible of general knowledge.

Here, there is no employer-employee relationship between the appellant and the appellee. In regard to the nature of the information contained within the plans, Slosburg testified that he considered the Vanderbilt plans to be proprietary information and that the time and involvement that went into developing the concept was the reason the development could be marketed at the price it was. Architect Molik testified that the Vanderbilt plans were unique in that they utilized "open concepts" and included private balconies, private storage, large closets, "nice usable kitchens [and] a little bit different bathroom if at all possible." Even if at the time of their design these features were distinctive in the Omaha community, they are simply not so unique that they would qualify the Vanderbilt plans for "trade secret" status.

Although in its petition the appellant did not allege violation of Nebraska's Trade Secrets Act, § 87-501 et seq., on appeal it is argued that the plans satisfy the definition of trade secret as contained in that act. A petition will be sufficient if, under the facts alleged, the law entitles a plaintiff to recover. *AMISUB v. Board of Cty. Comrs. of Douglas Cty., ante* p. 657, 508 N.W.2d 827 (1993). Although the existence of an employer-employee relationship is not a required element for misappropriation of a trade secret under the Trade Secrets Act, § 87-502(4) defines a trade secret as

> information, including, but not limited to, a drawing, formula, pattern, compilation, program, device, method, technique, code, or process that:
>
> (a) Derives independent economic value, actual or potential, from not being known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Again, the Vanderbilt plans do not contain the type of information which is unascertainable by proper means. Knowledge of "open concepts," balconies, and even room sizes may be readily gained by observation. In failing to establish the existence of an actual trade secret, the appellant also fails to allege an element necessary to establish a claim outside the scope of copyright protection.

Plaintiffs may not by miscasting their causes of action secure the equivalent of copyright protection under the guise of state law. *James v. Delilah Films, Inc.*, 144 Misc. 2d 374, 544 N.Y.S.2d 447 (1989).

The district court found that "[d]efendant's misappropriation of plaintiff's plans constitutes a deceptive trade practice of the Nebraska Uniform Deceptive Trade Practices Act, Section 87-302, et seq., R.R.S. 1943, entitling the plaintiff to the injunctive relief prayed for in its first cause of action." Neb. Rev. Stat. § 87-302 (Cum. Supp. 1990), in effect at the time this action was filed, enumerated 14 deceptive trade practices. However, the district court did not specify which of these was implicated in the instant case. Presumably pertinent to our analysis is § 87-302 of the Uniform Deceptive Trade Practices Act, which provides that

[a] person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, he or she:

(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another.

In *Nash v. CBS, Inc.*, 704 F. Supp. 823 (N.D. Ill. 1989), *aff'd* 899 F.2d 1537 (7th Cir. 1990), the court compared the goals of the Uniform Deceptive Trade Practices Act with those of the copyright act and found that the Uniform Deceptive Trade Practices Act sought to prevent unfair competition between suppliers and to protect consumers in the marketplace, while the purpose of the copyright act was to secure authors'

intellectual property rights. Although the court found that the goals of the two acts were similar, it concluded that the goal of consumer protection rendered the Uniform Deceptive Trade Practices Act sufficiently different from the copyright act to preclude preemption.

Protection of the consumer may also be the primary goal of the Uniform Deceptive Trade Practices Act, but the availability of protection from deception for both consumers and competitors may be inferred from the language of that act which states that "[i]n order to prevail in an action under sections 87-301 to 87-306, a complainant need not prove competition between the parties." § 87-302(14)(b). While the goal of consumer protection may provide the additional element necessary to set the claim apart from the rights afforded by the copyright act, that element is not at issue under the facts of this case, since no construction or marketing resulted from the reproduction of the plans. Here, McNeil did not "pass off" the plans as those of another, but did "pass off" the plans of Richdale as its own, at least to the extent that it removed the architects' names from the plans before they were distributed to subcontractors. However, even if architectural plans qualify as goods or services under § 87-302, factually they were only "passed off" to those subcontractors and not to any potential customer of either the appellant or the appellee. If protection of a customer is not implicated, then the rights which the law seeks to protect in this case are the same rights which are protected under the copyright act, which are the competitor's rights to control reproduction and distribution of the plans.

We refer here parenthetically to *Taco Cabana Intern., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113 (5th Cir. 1991), which was cited to us by counsel for appellant during his oral arguments, presumably to demonstrate that a federal court had found that use of another's architectural drawings could be the subject of a claim for misappropriation of a trade secret. However, in that case, both the owner of the blueprints and the defendant misappropriating the same were engaged in competing businesses. The court pointedly referred to the likelihood of confusion created in the minds of consumers as to the identity of the two restaurants. Furthermore, the action was brought

under the federal Lanham Trade-Mark Act, and no question of federal preemption was raised or decided.

Here, without the element of preventing consumer confusion, the rights the appellant seeks to protect under the Uniform Deceptive Trade Practices Act are apparently coextensive with the rights protected by the copyright act, as evidenced by the order of the district court which stated:

> WHEREFORE, IT IS ORDERED, that defendant, its officers, agents, representatives and employees be and the same are permanently enjoined from utilizing, reviewing, reproducing or distributing in any manner or fashion plaintiff's plans as described in Paragraph 9 of plaintiff's petition and identified as Exhibit No. 1 in trial.

Accordingly, the injunctive relief ordered by the district court grants the same rights to Richdale as are afforded under the copyright act, and the federal statute preempts the state law. Thus Richdale was not entitled to an injunction despite the fact that McNeil did not contest the granting of that relief. Litigants cannot confer subject matter jurisdiction on a judicial tribunal by either acquiescence or consent. *Marshall v. Marshall*, 240 Neb. 322, 482 N.W.2d 1 (1992); *Nebraska State Bar Found. v. Lancaster Cty. Bd. of Equal.*, 237 Neb. 1, 465 N.W.2d 111 (1991).

When a trial court lacks the power, that is, jurisdiction, to adjudicate the merits of a claim, an appellate court also lacks the power to adjudicate the merits of the claim. *Id.*; *Andrews v. City of Lincoln*, 224 Neb. 748, 401 N.W.2d 467 (1987).

Richdale argues that the court erred in finding that no damages had been sustained and that it abused its discretion in refusing to award attorney fees under the Uniform Deceptive Trade Practices Act. Neb. Rev. Stat. § 87-303(b) (Reissue 1987) provides that "[t]he court *in its discretion may* award attorneys' fees to the prevailing party if . . . the party charged with a deceptive trade practice has willfully engaged in the trade practice knowing it to be deceptive."

However, it is not necessary to discuss these two alleged errors other than to point out that both of these claims are preempted by federal law. See, federal Copyright Act of 1976 § 502 (court may grant temporary and final injunctions); § 504

(copyright owner is entitled to actual damages and profits); and § 505 (court may award a reasonable attorney fee).

The judgment of the district court is affirmed in all respects except the portion providing for the issuance of a permanent injunction, which portion of the judgment is reversed, and the cause is remanded with direction to dissolve the injunction.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTION.

WHITE, J., participating on briefs.

SHANAHAN, J., not participating.